# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PAUL CRUIKSHANK,              )

                  Plaintiff,      )

                         )       No. 19 C 1416

       v.                    )

                         )       Judge Sara L. Ellis

CHRISTIAN OKEZIE and LATONYA   )
WILLIAMS,                     )

                         )

            Defendants.     )

## OPINION AND ORDER

Plaintiff Paul Cruikshank, a prisoner currently incarcerated at Stateville Correctional Center ("Stateville"), brings this lawsuit pursuant to 42 U.S.C. § 1983, alleging that Defendants Dr. Christian Okezie and Physician's Assistant ("PA") Latonya Williams were deliberately indifferent to his serious medical needs when treating his hemorrhoids. Defendants have moved for summary judgment on Cruikshank's claims. Because no reasonable juror could conclude that Defendants were deliberately indifferent to Cruikshank's serious medical needs, the Court grants Defendants' motion.

## BACKGROUND[1]

### I.     Factual Background

Cruikshank is a 40-year-old male who has been incarcerated at Stateville since 2005. Wexford Health Sources, Inc. ("Wexford") is a private corporation that contracts with the Illinois

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts. The Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. The Court takes all facts in the light most favorable to Cruikshank, the non-movant.

Department of Corrections ("IDOC") to provide medical treatment to IDOC inmates, including those incarcerated at Stateville. Dr. Okezie served as Stateville's Medical Director from 2017 through October 10, 2018 when Dr. Marlene Henze assumed the role. PA Williams has worked at Stateville since December 2005. "At Stateville, inmates access medical care primarily through a system known as 'sick call,'" through which inmates can submit written requests for care through IDOC security officers. Doc. 128 ¶ 8 (citation omitted). Nurses then evaluate and address the inmates' complaints or refer them to see a physician if appropriate. When a Stateville medical professional recommends that an inmate receive offsite medical care, Wexford's utilization management team reviews the recommendation and either approves or denies the care.

Because this case involves Defendants' treatment of Cruikshank's hemorrhoids, the Court begins by briefly discussing some relevant medical background. "A hemorrhoid is a combination of . . . blood vessel[s] [and] extra connective tissue that sits in the anal canal and . . . aid[s] in continence." *Id.* ¶ 12. "[M]ost people are born with hemorrhoids," but over time, they "can become enlarged and cause symptoms such as pain, bleeding[,] or itching." *Id.* Hemorrhoids can be either internal (located within the rectum) or external (located on the anus). Internal hemorrhoids can cause bleeding, while external hemorrhoids can cause pain and can become thrombosed (contain a blood clot). The presence of a "thrombosed hemorrhoid does not necessarily speak to the severity or length of time the hemorrhoid has existed," and "the vast majority of thrombosed external hemorrhoids resolve with time." *Id.* ¶ 15. Hemorrhoids are not life-threatening but can cause extreme pain and disrupt an individual's day-to-day life. Hemorrhoids that cause "any bleeding, pain, itching[,] and/or mucous secretion" call for treatment, but hemorrhoids can worsen with or without treatment. *Id.* ¶ 18. Both nonsurgical

and surgical options exist for hemorrhoid treatment but "[i]t is customary," *id.* ¶ 20, and "preferred," *id.* ¶ 21, to utilize nonsurgical options first, including diet and lifestyle changes, ointments/creams, and sitz baths. A sitz bath is a hemorrhoid treatment in which a patient typically sits in a shallow basin of warm water to sooth the affected area. If a patient does not respond to nonsurgical treatment, medical professionals will then typically consider surgical options.

In 2015, Cruikshank began experiencing sporadic anal bleeding and pain. On February 4, 2015, Cruikshank saw Dr. Saleh Obaisi, the Stateville Medical Director at the time, complaining of occasional bleeding and constipation that resolved with a stool softener. Dr. Obaisi noted for the first time that Cruikshank's rectal exam revealed external and internal hemorrhoids and fecal blood. In response, Dr. Obaisi prescribed Cruikshank "a hemorrhoidal ointment to assist with pain, itching, and inflammation." *Id.* ¶ 27. Almost ten months later, on November 30, Cruikshank complained of sporadic pain and blood in his stool at a sick call appointment and received a prescription for a hemorrhoid cream. Shortly thereafter, on December 4, Dr. Alma Martija, a former Stateville physician, saw Cruikshank for his hemorrhoids. Dr. Martija noted that Cruikshank had internal hemorrhoids and several non-thrombosed external hemorrhoids, one of which was bleeding, and ordered Cruikshank a hemorrhoid cream.

Over two years later, on April 12, 2018, Cruikshank, complaining of pain, saw Dr. Okezie for the first time regarding his hemorrhoids. Dr. Okezie performed a physical exam and noted that Cruikshank had two engorged hemorrhoids that were "hard, tender, and painful." *Id.* ¶ 31. Dr. Okezie's notes indicate that he prescribed Cruikshank Anusol Suppositories, a prescription-strength hemorrhoidal ointment, but Cruikshank received Preparation H, a non-prescription hemorrhoidal ointment, from the pharmacy instead. Dr. Okezie also requested that

Cruikshank return for reevaluation within one week because typically "if the patient has no relief within a week and the conservative treatments are not helping, Dr. Okezie would then consider sending the patient for a surgical evaluation." *Id.* ¶ 34. However, Cruikshank did not return to Dr. Okezie within one week. Dr. Okezie testified that, in his experience, this typically indicated that the treatment had worked, so he did not investigate why Cruikshank had not followed up with him.

Twelve days later, Cruikshank presented to PA Williams complaining of pain in his buttocks, back, and knee, and that the hemorrhoid ointment made him itchy. Cruikshank testified that each time he saw PA Williams between April 2018 and July 2019, he told her that his hemorrhoids were worsening and that he believed he needed a surgical evaluation. According to PA Williams, she would have documented any of Cruikshank's complaints in her notes. PA Williams noted that Cruikshank deferred a physical rectal exam on April 24, but Cruikshank testified that he never refused a rectal exam. PA Williams testified that she typically reviews a patient's medical chart from recent visits to better understand a patient's medical history. On April 24, she noted that Cruikshank had not received the Anusol that Dr. Okezie had intended to prescribe him. So, PA Williams prescribed Cruikshank Anusol HC to address his "complaints of swelling, itching, pain, and inflammation inside the rectum" and instructed him to "return to sick call as needed." *Id.* ¶ 37. PA Williams also referred Cruikshank to see Dr. Okezie regarding a shoe lift to address Cruikshank's remaining complaints.

Cruikshank met with Dr. Okezie three days later. Dr. Okezie's notes from the visit relate to Criukshank's radicular lumbar scoliosis; he did not document any complaints made by Cruikshank regarding his hemorrhoids and "did not prescribe or provide any treatment for [Cruikshank's] hemorrhoids at this assessment." *Id.* ¶ 40. However, Cruikshank testified that

each time he saw Dr. Okezie between April 2018 and July 2019, he told Dr. Okezie about his worsening hemorrhoids, that the provided creams/ointments were not relieving his symptoms, and that he believed he needed a surgical evaluation. According to Dr. Okezie, if a patient complains about a symptom, he documents it in his notes.

Shortly after, on May 4, Cruikshank submitted a grievance regarding his hemorrhoids, explaining that he had "'really bad hemorrhoids' that he has been complaining about for [one and a half] years." *Id.* ¶ 41 (citation omitted). Cruikshank noted that he was bleeding two to three times per week and that it often hurt to sneeze, cough, or sit down. On May 22, Cruikshank submitted a second grievance, complaining that his hemorrhoid pain had worsened, the prescribed ointments had not relieved his pain, and that he was still bleeding two to three times per week. On May 30, Cruikshank saw Dr. Okezie following his referral to the University of Illinois Chicago ("UIC") for an evaluation by a radicular lumbar surgeon. Dr. Okezie's notes from this visit do not document any complaints by Cruikshank regarding his hemorrhoids and Dr. Okezie did not provide any treatment for Cruikshank's hemorrhoids at this visit.

On June 8, Cruikshank made a sick call appointment to complain about his hemorrhoids. Cruikshank reported that the prescribed cream had not helped his pain, he had blood in his stool, he was itchy, and he had a protrusion from his rectum. The nurse provided him with a hemorrhoid cream and referred him to see a doctor. On June 12, a Stateville staff physician determined that Cruikshank's hemorrhoids were external and thrombosed, ordered him a pain-relieving ointment and a stool softener, and referred him to see Dr. Okezie. Cruikshank saw Dr. Okezie on June 19 for the fourth and final time. Dr. Okezie's notes from this visit do not document any complaints by Cruikshank regarding his hemorrhoids, and Dr. Okezie did not

5

provide any treatment for Cruikshank's hemorrhoids at this visit. Instead, Dr. Okezie's notes from this visit discuss Cruikshank's visit to a radicular lumbar surgeon at UIC.

Over one month later, on July 24, Cruikshank again presented to a sick call appointment complaining about his "terrible hemorrhoids." *Id.* ¶ 47. A nurse again provided him with hemorrhoid cream and referred him to a doctor. Cruikshank saw PA Williams two days later, on July 26, and complained of "bad hemorrhoids with leakage and pain" but reported that the stool softener had been helpful. *Id.* ¶ 48. PA Williams performed a physical exam and documented that Cruikshank had moderate external hemorrhoids. In response, PA Williams renewed Cruikshank's prescription for stool softeners and narcotic pain medication and made a "non-urgent but ASAP referral to the Medical Director to have [him] assessed for a surgical evaluation." *Id.* ¶ 50.

However, Cruikshank did not see the Medical Director until approximately four months later, on November 21. In the meantime, Cruikshank filed two grievances regarding his hemorrhoids, on August 18 and October 1. In the August 18 grievance, Cruikshank complained that he was in extreme pain when he defecated, that it hurt to sit and walk, and that he was still bleeding at least three times per week. Cruikshank requested to see the Medical Director, explaining that although PA Williams had put in a referral, no one had scheduled the visit. Almost two months later, on October 1, Cruikshank again complained that it hurt to sit and walk and that he was almost always bleeding. He also reported that although PA Williams had referred him to see the Medical Director in July, the appointment had not yet occurred. Cruikshank further complained that his condition had worsened over the last six months and that he "is going to be forced to spend money to make another sick call appointment." *Id.* ¶ 52. About two weeks later, on October 1, Cruikshank made a sick call appointment regarding his hemorrhoids. He

reported that he was bleeding, was itchy and in pain, had a protrusion on his rectum, and had "severe engorgement or distension." *Id.* ¶ 53. The nurse again referred Cruikshank to the Medical Director.

Cruikshank met with the Medical Director, then Dr. Henze, regarding his hemorrhoids on November 21. Dr. Henze examined Cruikshank and found multiple large external hemorrhoids without thrombosis, but which she believed to be severe. Given Cruikshank's complaints and the length of his hemorrhoid condition, Dr. Henze recommended that Cruikshank receive a colorectal evaluation at UIC, which Wexford approved on December 4. On January 25, 2019, Cruikshank presented to PA Williams complaining that his hemorrhoids were painful. PA Williams informed Cruikshank that Wexford had approved his colorectal evaluation and that an appointment was pending. She ordered him a donut to sit on and a "lay in" which allowed him to have his meals delivered to his cell in the meantime. *Id.* ¶ 57. PA Williams noted that Cruikshank deferred a physical rectal exam during this visit but Cruikshank testified that he never refused a rectal exam. About one month later, on February 27, Cruikshank met with Dr. Gerald Gantt for a colorectal evaluation at UIC. The exam revealed hemorrhoids in all three anal columns and evidence of prior bleeding and hemorrhoids that had healed. Dr. Gantt prescribed Cruikshank "over-the-counter fiber supplements, stool softeners, Preparation H, a hemorrhoid ointment, and sitz baths twice per day and following bowel movements." *Id.* ¶ 60. Dr. Gantt recommended that Stateville bring Cruikshank back in one month for re-evaluation.

Upon Cruikshank's return to Stateville, he met with Dr. Henze who submitted a referral for Cruikshank to return to UIC for a follow-up appointment in one month. However, pursuant to Stateville's policy, Dr. Henze did not provide Cruikshank with a sitz bath because basins or pans pose a safety risk. Instead, on March 5, Dr. Henze admitted Cruikshank to the infirmary for

daily baths. Dr. Gantt testified that "there is not a significant difference between sitz baths and ordinary baths" and that he often recommends ordinary baths to his patients instead of sitz baths. *Id.* ¶ 67. Cruikshank spent nine days in the infirmary until Dr. Henze discharged him because of limited capacity in the infirmary. Approximately two months later, on May 2, Cruikshank saw PA Williams regarding his hemorrhoids. She informed him that his follow-up appointment at UIC had been scheduled and provided him with stool softeners, pain medicine, and topical hemorrhoid treatment.

On June 19, 2019, almost four months after his initial appointment, Cruikshank returned to UIC for his follow-up appointment with Dr. Gantt. Cruikshank complained of "pain and bleeding with defection" and reported that the provided ointments and sitz baths gave him minimal relief. *Id.* ¶ 74. A physical exam "revealed internal hemorrhoids and external hemorrhoids with mucosal ulceration and some evidence of thrombosis." *Id.* Because the nonsurgical treatments had not alleviated Cruikshank's symptoms, Dr. Gantt recommended that Cruikshank "undergo surgical excision of his hemorrhoids." *Id.* Dr. Gantt performed Cruikshank's surgery on July 24, 2019 and was able to remove two of his three symptomatic hemorrhoids. On January 15, 2021, Dr. Gantt removed Cruikshank's remaining symptomatic hemorrhoid. Cruikshank testified that as of February 3, 2021, he was "not experiencing any recurring hemorrhoids," *id.* ¶ 78, and Dr. Gantt testified that Cruikshank's "hemorrhoid condition is effectively corrected for now," *id.* ¶ 79.

## II. Procedural Background

Cruikshank filed four grievances regarding the treatment of his hemorrhoids: on May 4, 2018; May 22, 2018; August 18, 2018; and October 1, 2018. On January 28, 2019, IDOC denied Cruikshank's grievances. On February 26, 2019, Cruikshank filed a *pro se* complaint naming

Dr. Saleh Obaisi, Dr. Okezie, and the Stateville Warden in his official capacity as Defendants.[2]

The Court recruited counsel for Cruikshank, who filed the operative second amended complaint,

adding PA Williams as a Defendant. Defendants now move for summary judgment.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the

pleadings and assess the proof as presented in depositions, documents, answers to

interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.

Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).

The party seeking summary judgment bears the initial burden of demonstrating that no genuine

dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed.

Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-

moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above

to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P.

56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627

(7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving

party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719

F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue

of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th

Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by

---

[2] The Court has since dismissed Dr. Obaisi and the Stateville Warden as Defendants. Doc. Nos. 72, 114.

admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

Health care providers violate the Eighth Amendment when they act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Deliberate indifference has both objective and subjective elements: (1) the inmate must have an objectively serious medical condition; and (2) the defendant must be subjectively aware of and disregard a substantial risk of harm to the inmate's health. *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020); *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). Because Defendants concede, for the purposes of this motion, that Cruikshank's hemorrhoid condition constitutes an objectively serious medical condition, the Court solely considers whether a reasonable jury could find in Cruikshank's favor on the subjective element of his deliberate indifference claims.

To satisfy the subjective element, the defendant must: (1) actually know about a substantial risk of harm to an inmate; and (2) disregard that risk. *Petties*, 836 F.3d at 728; *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). This requires the defendant to act with a sufficiently "culpable state of mind, something akin to criminal recklessness." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). Negligence, even gross negligence, does not satisfy this standard. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Nor does objective recklessness, i.e., "failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known." *Petties*, 836 F.3d at 728 (emphasis in original).

The Court must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.* Although a

mistake in professional judgment alone does not constitute deliberate indifference, evidence that a defendant "knew better than to make the medical decision[s]" that he or she made is enough to survive summary judgment. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016) (citation omitted). Evidence sufficient to create a jury question as to a medical professional's state of mind might include:

> the obviousness of the risk from a particular course of treatment; the defendant's persistence in a course of treatment known to be ineffective; or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment.

*Id.* at 663 (citations omitted) (internal quotation marks omitted).

## I.     Dr. Okezie

Dr. Okezie met with Cruikshank four times in 2018: on April 12, April 27, May 30, and June 19. Cruikshank contends that Dr. Okezie was deliberately indifferent to his medical needs at these visits by: (A) failing to prescribe Cruikshank sitz baths or refer him for surgery on April 12 despite knowing that Cruikshank had painful external hemorrhoids; (B) failing to document Cruikshank's complaints regarding his hemorrhoids, perform a physical exam, provide any treatment for his hemorrhoids, or refer him for surgery on April 27, May 30, and June 19; and (C) failing to evaluate Cruikshank for surgery after PA Williams made a referral to him on July 26. Cruikshank argues that Dr. Okezie's actions "needlessly delayed" his treatment and prolonged his suffering for no legitimate reason. Doc. 137 at 8.

### A.     April 12 Visit

When Cruikshank discussed his hemorrhoids with Dr. Okezie on April 12, it was the first time Cruikshank had complained of his hemorrhoids in over two years. In response, Dr. Okezie documented the complaints, performed a physical exam, prescribed Cruikshank a hemorrhoid

11

ointment, and instructed him to follow-up in one week. Cruikshank challenges Dr. Okezie's treatment decisions, but "[t]o infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396. Put another way, the Court must defer to Dr. Okezie's course of treatment unless "no minimally competent professional would have so responded under those circumstances." *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 520 (7th Cir. 2019) (citation omitted).

Cruikshank admits that "[i]t is customary" for medical professionals to first try nonsurgical treatment options for hemorrhoids before evaluating surgical options, Doc. 128 ¶ 20, and that "[c]onservative treatment is preferred before escalating to more invasive measures, such as surgery, as hemorrhoid excision surgery carries inherent risks," *id.* ¶ 21. Further, hemorrhoid ointments had seemingly alleviated Cruikshank's symptoms in 2015, and the specialist, Dr. Gantt, took the same conservative approach to Cruikshank's symptoms ten months later (he first tried nonsurgical treatment options before resorting to surgery). Therefore, the Court must defer to Dr. Okezie's judgment. *See Reese v. Trost*, No. 17-cv-1332, 2020 WL 5645306, at *5 (S.D. Ill. Sept. 22, 2020) (finding doctor entitled to summary judgment where he "utilized his professional judgment in addressing [p]laintiff's complaints" and prescribed nonsurgical treatment options for plaintiff's hemorrhoid condition despite plaintiff's requests for a "less-conservative treatment regimen").

Cruikshank argues that Dr. Okezie "failed to follow (even the most basic) existing prison protocols and practices" regarding his hemorrhoids on April 12 because he did not prescribe a sitz bath or refer Cruikshank for a surgical evaluation. Doc. 137 at 7. Specifically, Cruikshank points to Wexford's General Surgery Guidelines, which list the following primary treatments for

12

hemorrhoids: "[s]itz bath, stool softener and/or fiber, anti-inflammatory ointment, local anesthetics." Doc. 136-1 at 2. However, these guidelines do not mandate a preferred treatment method for hemorrhoids. Instead, they simply provide a list of possible nonsurgical treatment options for medical professionals to consider before surgery. Cruikshank admits that "Wexford's ultimate guidance to its clinicians is that all medical personnel should rely on their education, training and experience in treating patients." Doc. 128 ¶ 7. The preface page of Wexford's General Surgery Guidelines makes this clear: "Clinical pathways do not replace sound clinical judgment, nor are they intended to strictly apply to all patients. The specific strategies and pathways presented in this manual provide a clinical management approach, but their application is a decision made by the practitioner accounting for individual circumstances." Doc. 143 at 2. Moreover, Cruikshank admits that Stateville does not offer sitz baths because the basins/pans pose a safety risk and are not permitted in the maximum-security prison. Cruikshank puts forth general Wexford and IDOC policies and guidelines regarding sitz baths, but he does not provide any evidence to suggest that Dr. Okezie could feasibly prescribe sitz baths for a prisoner incarcerated at Stateville.

Cruikshank also asserts that Dr. Okezie failed to follow Stateville's practice of reserving surgery for thrombosed external hemorrhoids when he did not refer Cruikshank for surgery on April 12. However, Dr. Okezie determined at this visit that Cruikshank had two engorged hemorrhoids which Dr. Okezie testified, in his judgment, differed from thrombosed external hemorrhoids. Doc. 128-2 at 16. When Cruikshank first complained of his hemorrhoids to Dr. Okezie, Dr. Okezie exercised his judgment by choosing one of the possible nonsurgical treatment options that he deemed most appropriate. There is no evidence in the record that treating hemorrhoids in this manner is "so far afield of accepted professional standards as to raise

13

the inference that" such a decision "was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396; *see Bowens v. Schrubbe*, No. 17-C-1124, 2020 WL 3964386, at *5 (E.D. Wis. July 13, 2020) (finding that despite alleged deviation from protocol, plaintiff failed to bring evidence "to show that Nurse DeYoung was deliberately indifferent to his pain or that she was unable to make her own judgment about . . . his pain"); *Collazo v. Talbot*, No. 11-CV-2018, 2013 WL 2181184, at *15 (C.D. Ill. May 20, 2013) ("To the extent that [Defendants] refused to order surgery, Talbot not only relied on the advice of a specialist, but also prescribed a variety of alternative therapies [for plaintiff's severe hemorrhoids] that he testified are medically adequate. Plaintiff does not contend that the alternative therapies were so blatantly inappropriate as to evidence intentional mistreatment, just that he wanted surgery."). Thus, Cruikshank has failed to put forth sufficient evidence to create a jury question as to Dr. Okezie's state of mind on April 12.

      **B.**    **April 27, May 30, and June 19 Visits**

      Second, Cruikshank testified that he complained to Dr. Okezie at every visit that: (1) his hemorrhoids were worsening, (2) the provided creams/ointments were not relieving his symptoms, and (3) he believed he needed a surgical evaluation; however, on April 27, May 30, and June 19, Dr. Okezie failed to: (1) document Cruikshank's complaints; (2) perform a physical exam; (3) provide any treatment; or (4) refer him for surgery. No complaints regarding Cruikshank's hemorrhoids appear in Dr. Okezie's notes from these visits. Dr. Okezie testified that if Cruikshank had made such complaints, Dr. Okezie would have documented them.

      The Court must take the facts in the light most favorable to Cruikshank when evaluating Defendants' motion for summary judgment and accept Cruikshank's testimony as true. *See Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021) ("[Plaintiff's] first-hand account of that

conversation is competent evidence, even if one alternatively could infer from the lack of mention in the note that the issue was not raised."); *Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020) ("[A] witness's self-interest does not prevent a trier of fact from crediting a statement based on personal knowledge."). Defendants contend that the Court can make a credibility determination here because Cruikshank's testimony is "blatantly contradicted by the record." Doc. 141 at 12 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). But not only does the law forbid the Court from making credibility determinations, *see Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021) ("A district court judge 'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts' when ruling on a motion for summary judgment." (citation omitted)), Defendants' characterization of the evidence is unconvincing. The proximity in time between the grievances Cruikshank filed in May (May 4 and May 22), stating that his hemorrhoids were continuing to cause him pain and impact his daily life, and two of these visits (April 27 and May 30) supports the inference that Cruikshank's hemorrhoids were of great concern to him at the time and thus, he complained about them to Dr. Okezie. *See Thomas*, 991 F.3d at 769 (noting that plaintiff's "concurrent grievance immediately after the appointment [which included his request] also supports a finding that he did, in fact, mention his request" during the appointment).

Cruikshank's version of events could support that Dr. Okezie knew of a risk of harm to Cruikshank (that his hemorrhoids could continue to cause him pain until a specialist surgically removed them), but no reasonable juror could find that Dr. Okezie disregarded that risk or caused Cruikshank any harm. *See Thomas*, 991 F.3d at 770 ("[I]t is still necessary to link that harm or the risk thereof to the defendant."). Cruikshank argues that Dr. Okezie's actions "needlessly delayed [his] necessary hemorrhoid treatment, [and] prolong[ed his] severe pain,

bleeding, [and] embarrassment . . . for no penological purpose whatsoever." Doc. 137 at 8. But because "delays are common in the prison setting with limited resources," *Petties*, 836 F.3d at 730, when evaluating a delay in treatment, courts must evaluate "how serious the condition in question was [and] how easy it would have been to treat it," *Thomas*, 991 F.3d at 769. "[A] plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730–31. Such evidence includes expert testimony and "medical records or physician's notes that 'tend [] to confirm or corroborate a claim that the delay was detrimental." *Quinn v. Obaisi*, No. 14-cv-6633, 2018 WL 1184736, at *6 (N.D. Ill. Mar. 7, 2018) (alteration in original) (quoting *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007)).

The parties do not dispute that the surgeries Cruikshank received at UIC in 2019 and 2021 "effectively corrected" his hemorrhoid condition "for now." Doc. 128 ¶ 79. Cruikshank does not appear to argue, and the record does not support, that any delay in this treatment exacerbated his hemorrhoids. Cruikshank's medical records do suggest that his hemorrhoids caused him pain from the time he first complained to Dr. Okezie in April 2018 through when Dr. Gantt surgically removed his last symptomatic hemorrhoid in 2021. However, nothing in the record suggests that the alleged delay in this treatment, as opposed to his condition, caused or unnecessarily prolonged Cruikshank's pain. *See Williams*, 491 F.3d at 714–15 ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." (citation omitted)). Indeed, Cruikshank admits that "[c]onservative treatment is preferred [for hemorrhoids] before escalating to more invasive measures, such as surgery," Doc. 128 ¶ 21, and that "[h]emorrhoids can get worse

whether they are treated or not treated," *id.* ¶ 20.  Cruikshank also admits that hemorrhoids are not life-threatening and that "a vast majority of thrombosed external hemorrhoids resolve with time."  *Id.* ¶ 15.

Instead, the record suggests that it is customary and preferred for medical providers to first assess the effectiveness of nonsurgical treatment options before considering whether surgery is appropriate.  Dr. Okezie determined on April 12 that Cruikshank had two engorged and painful hemorrhoids, prescribed him an ointment, and asked that he follow-up in one week. Looking at the totality of Cruikshank's medical care over the next three months, various medical professionals at Stateville prescribed him with stool softeners and at least three different hemorrhoid ointments/creams to address his continuing pain.  When Cruikshank first presented to Dr. Gantt over ten months after Dr. Okezie's initial assessment, the specialist: (1) determined that there was evidence of prior hemorrhoids that had healed and that Cruikshank had hemorrhoids in all three anal columns, (2) prescribed him with various nonsurgical treatment options (including a stool softener and hemorrhoid ointment), and (3) asked that he follow-up in one month.  Ultimately, Dr. Gantt only resorted to surgery when Cruikshank's symptoms failed to improve.  In other words, even the specialist did not immediately order the surgical removal of Cruikshank's hemorrhoids ten months after Cruikshank first complained to Dr. Okezie that his hemorrhoids caused him pain. *Cf. Reese*, 2020 WL 5645306, at *4 (finding that "a three-month delay" between plaintiff's first appointment with defendant and "his first examination with an outside specialist [did] not give rise to a constitutional violation" where there was "no evidence that any delay exacerbated [p]laintiff's condition," that plaintiff was in pain at the time, or that "Dr. Trost knowingly delayed the referral at a substantial risk to [p]laintiff's health"); *Bowens*, 2020 WL 3964386, at *7 (finding that plaintiff failed to offer any evidence that delay constituted

deliberate indifference where plaintiff's own medical expert reported that plaintiff was "doing well with" the previously prescribed treatment and continued it).

This is not a case in which a delay in treatment limited the patient's available treatment options or caused irreversible damage. *See Arnett v. Webster*, 658 F.3d 742, 752–53 (7th Cir. 2011) (finding that a ten-month delay in providing any medication to treat plaintiff's rheumatoid arthritis, causing pain and irreversible damage and deformity, was sufficient to state an Eighth Amendment claim); *Quinn*, 2018 WL 1184736, at *6 (finding plaintiff "offered sufficient verifying medical evidence to show that the eight-month gap between when the UIC doctor recommended that [he] return for a banding procedure and his actual return to UIC exacerbated and prolonged his pain" where UIC doctor's notes indicated that plaintiff's "hemorrhoids had grown and were too large for the banding procedure" upon his return, requiring plaintiff to endure more painful and risky surgical excision of hemorrhoids). Nor is this a case in which a jury could reasonably infer, based on the severity of the condition and availability of effective treatments, that a delay in treatment unnecessarily prolonged the patient's pain. *See Thomas*, 991 F.3d at 771 (noting that a "jury could conclude that the delay in adequately treating Thomas's hand injury led to nerve damage and improper healing" where independent medical reports indicated that he "suffered from diminished sensation in his fingers and healing abnormalities" by the time the specialist evaluated Thomas); *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (denying summary judgment based on defendants' failure to provide patient, who suffered from gastro-esophageal reflux disease, with over-the-counter pills for two months). Given the nature of hemorrhoids, the complexity involved in treating them, and the consistently conservative treatment Cruikshank received for his hemorrhoids from other providers during this time, a jury could not reasonably infer that Dr. Okezie disregarded a

substantial risk of harm to Cruikshank on April 27, May 30, and June 19 by exacerbating his hemorrhoids or unnecessarily prolonging his pain.

### C.     No Visits After July 26

Last, Cruikshank appears to argue that despite PA Williams' referral of Cruikshank to Dr. Okezie on July 26 for a surgical assessment, Dr. Okezie did not evaluate Cruikshank again before leaving the Medical Director position on October 10, 2018.  However, Dr. Okezie testified that he does not schedule appointments and that he does not know why he did not see Cruikshank between July 26, 2018 and October 10, 2018.  Doc. 128-2 at 16, 18, 25.  Dr. Henze also testified that as Stateville Medical Director, she does not control her schedule.  Doc. 128-5 at 18.  Cruikshank does not put forth any evidence to refute this testimony.  Thus, no reasonable juror could conclude that Dr. Okezie played any role in the delay after PA Williams' July 26 referral.  *See King v. Maassen*, No. 19-cv-382, 2020 WL 6196290, at *6 (W.D. Wis. Oct. 22, 2020) (finding "defendants cannot be held liable for any delay in treatment that plaintiff may have experienced" where "no evidence show[ed] that [they] caused that delay").  Because Cruikshank has failed to demonstrate that a genuine issue of material fact exists as to Dr. Okezie's treatment of Cruikshank's hemorrhoids, the Court grants summary judgment in Dr. Okezie's favor on Cruikshank's deliberate indifference claim.

## II.     PA Williams

PA Williams evaluated Cruikshank four times, but Cruikshank only challenges the care he received from her on April 24, 2018 and July 26, 2018.  Cruikshank contends that PA Williams was deliberately indifferent to his medical needs on April 24 by: (1) prescribing him an ointment she knew to be ineffective, (2) failing to perform a rectal exam, (3) failing to prescribe him sitz baths, and (4) failing to refer him for an offsite surgical evaluation.  Cruikshank argues

that PA Williams was deliberately indifferent to his medical needs on July 26 by: (1) continuing the ineffective course of treatment, (2) again failing to prescribe him sitz baths, (3) failing to ensure the Medical Director saw him pursuant to her referral, and (4) again failing to refer him for an offsite surgical evaluation. However, as previously explained, Cruikshank must present more than a disagreement with PA Williams' chosen course of treatment. The Court must defer to PA Williams' treatment decisions unless "no minimally competent professional would have so responded under those circumstances." *Wilson*, 932 F.3d at 519 (citation omitted). A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Given these standards, no reasonable jury could find that PA Williams was deliberately indifferent in treating Cruikshank's hemorrhoids. When Cruikshank first complained to PA Williams regarding his hemorrhoids on April 24, she prescribed him a different hemorrhoid ointment and instructed him to return to sick call as needed. Cruikshank argues that PA Williams knew the ointment she prescribed him had been ineffective, but the record does not support this. On April 24, Cruikshank informed PA Williams that traditional hemorrhoid ointments were not effective, and PA Williams noted that Cruikshank had not received the prescription-strength ointment that Dr. Okezie had intended to prescribe him on April 12. In response, PA Williams exercised her judgment by prescribing the prescription-strength ointment and instructing Cruikshank to return if his symptoms persisted. Again, the Court notes that Cruikshank admits that conservative treatment for hemorrhoids is customary and preferred and that even specialist Dr. Gantt did not immediately refer Cruikshank for surgery when he evaluated the hemorrhoids approximately ten months later.

20

When Cruikshank returned to PA Williams approximately three months later (on July 26)
complaining about his hemorrhoids, she referred him to the Medical Director for a surgical
evaluation and renewed his prescriptions, one of which he reported had helped. Thus, no
reasonable juror could conclude that PA Williams' treatment of Cruikshank's hemorrhoids was
"so far afield of accepted professional standards as to raise the inference that it was not actually
based on a medical judgment." *Norfleet*, 439 F.3d at 396; *see Lloyd v. Moats*, 721 F. App'x 490,
494 (7th Cir. 2017) (finding no deliberate indifference where defendants' treatment "reflect[ed] a
level of continuous care that is not consistent with a malicious state of mind"); *McGee v. Adams*,
721 F.3d 474, 481–82 (7th Cir. 2013) (finding that the defendants' "meaningful and ongoing
assessment of a patient's condition [was] the antithesis of 'deliberate indifference'").

Cruikshank challenges specific alleged omissions in PA Williams' course of treatment,
but given the actions PA Williams did take, the record does not suggest that she acted with
deliberate indifference. First, with respect to the sitz baths, as with Dr. Okezie, nothing in the
record suggests that PA Williams' failure to prescribe Cruikshank pans/basins for sitz baths on
April 24 and July 26 constituted deliberate indifference. Second, regardless of whether
Cruikshank deferred a physical exam on April 24, nothing in the record suggests that PA
Williams' failure to perform one constituted deliberate indifference. Cruikshank directs the
Court to *Reese v. Trost* where a court in this Circuit determined that a genuine issue of material
fact precluded summary judgment in favor of a nurse practitioner where the provider "refused to
conduct" a rectal exam and "failed to order any particular treatment regimen" for plaintiff's
hemorrhoids despite his complaints. 2020 WL 5645306, at *5. However, here, PA Williams did
not fail to order any treatment regimen—she prescribed Cruikshank with an ointment to address

21

his complaints—and there is no evidence to suggest that PA Williams refused to conduct an appropriate exam.

Third, the record is somewhat unclear regarding whether PA Williams had the authority to refer Cruikshank for an offsite surgical evaluation. *Compare* Doc. 128-2 at 10 (Dr. Okezie testifying that a PA could refer a patient for outside care), *with* Doc. 128-3 at 6 (PA Williams testifying that she cannot refer a patient for outside care). Regardless of whether she had this authority, as the Court explained regarding Dr. Okezie's care, nothing in the record suggests that PA Williams' decision to continue with conservative treatment on April 24, within weeks of Cruikshank's symptoms first re-appearing, was "so far afield of accepted professional standards as to raise the inference that" such a decision "was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396. And on July 26, PA Williams referred Cruikshank to the Medical Director to be "assessed for a surgical evaluation," Doc. 128 ¶ 50, which she believed was all she had the authority to do, Doc. 128-3 at 6. Without more, PA Williams' alleged misunderstanding of her authority cannot support a claim of deliberate indifference. *See Petties*, 836 F.3d at 728 ("To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind."); *Whiting*, 839 F.3d at 662 ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference.").

Finally, Cruikshank challenges PA Williams' failure to ensure that Cruikshank saw Dr. Okezie following her referral on July 26. But Cruikshank fails to put forth any evidence that suggests this was a legitimate expectation of PA Williams or that the failure to follow-up indicates "something akin to criminal recklessness." *Norfleet*, 439 F.3d at 397; *see King*, 2020 WL 6196290, at *7 (granting summary judgment in favor of nurse on deliberate indifference claim where "the undisputed facts show that nurses have no control over an advanced care

22

provider's schedule, and an initial appointment can be moved for a variety of reasons, such as more urgent medical needs or the provider's availability"); *Swanigan v. Obaisi*, No. 15 C 6797, 2017 WL 5129001, at *4 (N.D. Ill. Nov. 6, 2017) ("The rescheduled appointments that Swanigan points to are nothing like the delays that courts have found to violate the Eighth Amendment. Rather, the rescheduled appointments are the type of occurrence 'common in [a] prison setting with limited resources.'" (alteration in original) (citations omitted)). Ultimately, there is insufficient evidence in the record upon which a reasonable jury could find that "no minimally competent professional" would have responded the way PA Williams did in the circumstances she faced. *Wilson*, 932 F.3d at 519 (citation omitted). As a result, the Court grants summary judgment in PA Williams' favor on Cruikshank's deliberate indifference claim.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [129] and enters judgment for Defendants on Cruikshank's complaint. Case terminated.

Dated: July 13, 2022

_____
SARA L. ELLIS
United States District Judge